IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-781-D

| | | |
|---|---|---|
| RAYMOND J. TAHIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JEFFERSON B. SESSIONS, in his | ) | |
| official capacity as Attorney General | ) | |
| of the United States,[1] | ) | |
| | ) | |
| Defendant. | ) | |

On August 31, 2016, Raymond J. Tahir ("Tahir" or "plaintiff") a former supervisory investigative specialist with the Federal Bureau of Investigation ("FBI") filed a Title VII national origin discrimination action against defendant. See [D.E. 1]. On January 5, 2017, defendant moved to dismiss the complaint for failure to state a claim upon which relief can be granted [D.E. 12] and filed a memorandum in support [D.E. 13]. See Fed. R. Civ. P. 12(b)(6). On January 26, 2017, Tahir responded in opposition [D.E. 14]. As explained below, the court grants the motion to dismiss and dismisses the complaint without prejudice.

I.

On October 6, 1986, Tahir began working for the FBI in New York as a clerk in the NCIC Editorial Staff Unit of Technical Services. Compl. [D.E. 1] ¶¶ 6–7. Tahir is an American citizen of Turkish decent and identifies as an Arab American. Id. ¶¶ 5, 9. From July 1987 until July 1996, Tahir worked in the New York Division's Special Surveillance Group ("SSG"). Id. ¶¶ 7–9.

---

[1] On February 9, 2017 Jefferson B. Sessions was sworn in as the 84th Attorney General of the United States. Thus, the court substitutes Jefferson B. Sessions for Loretta Lynch. See Fed. R. Civ. P. 25(d).

In July 1996, the FBI promoted Tahir to Supervisory Investigative Specialist and transferred him to Dallas, Texas. See id. ¶ 10. The FBI issued Tahir a government-issued credit card for incidental work expenses. Id. ¶ 11. Tahir sometimes used the credit card for "non-work purposes and paid off the statements monthly." Id.

In 2000, the FBI disciplined Tahir and several other employees in his division for improperly using their government-issued credit cards. Id. ¶ 12. Tahir admitted to using the card for personal purposes and received a three-day suspension. Id. "This was the only time prior to his termination at issue in this case that . . . Tahir was disciplined." Id.

In June 2005, the FBI transferred Tahir to Charlotte, North Carolina, where he served as a Mobile Surveillance Team Leader. Id. ¶ 13. In 2006, the FBI promoted Tahir to Supervisory Investigatory Team Leader. Id. Starting in 2007, Tahir began to experience financial stress. Id. ¶ 14. From 2007 through 2011, Tahir used his government-issued credit card to make "roughly 200" personal purchases. Id. ¶ 14.

In July 2010, the FBI transferred Tahir to Raleigh, North Carolina so that Tahir could be closer to his children. See id. ¶ 15. Tahir stepped down in position to Supervisory Team Leader. Id.

On August 30, 2011, Assistant Special Agent in Charge ("ASAC") James E. Jewell learned that Tahir's government-issued credit card had a balance of $9,294.87. Id. ¶ 18. An audit revealed 233 purchases for personal use over a four-year period. Id. ¶ 19. Three of the purchases were in Dearborn, Michigan for $1,250.99, and Tahir denies making those purchases. Id. ¶ 19.

On September 1, 2011, Tahir met with ASAC Jewell, Tahir's de facto supervisor Jennifer McMillan, and Acting Supervisory Special Agent Robert Creager to discuss the purchases. See id. ¶¶ 16, 20. On September 14, 2011, the FBI formally notified Tahir that it had started an internal

investigation of Tahir for Misuse of a Government Charge Card-Personal Use and Lack of Candor/Lying-No Oath. See id. ¶ 21.

On November 9, 2011, FBI internal investigators (including SSA Chaney) presented Tahir with his credit card statements. See id. ¶ 22. Tahir noticed the three purchases in Dearborn, Michigan and denied ever being in Dearborn, Michigan or making those three purchases. See id. SSA Chaney responded that he had heard from several people in the office that Tahir was from Dearborn, Michigan. See id. According to Tahir, Dearborn, Michigan is significant to the FBI because "it is known as a hotbed of terrorist activity in the United States. By linking . . . Tahir to Dearborn, he was marked as a threat to the integrity of the [FBI]." Id. ¶ 23.

On December 8, 2011, the FBI expanded its investigation to include potential unauthorized gasoline purchases. See id. ¶ 24. On January 9, 2012, the FBI informally notified Tahir that he was charged with Misuse of a Government Charge Card (Theft) Gasoline or Automated–Related Expenses due to the fuel purchases. Id. ¶¶ 24, 31. The FBI questioned Tahir about the fuel purchases, and he justified the vast majority of them based on his cases. Id. ¶ 25. The FBI never formally notified Tahir that he was charged with Misuse of a Government Charge Card (Theft) Gasoline or Automated–Related Expenses. Id.

At the end of the internal investigation, the FBI recommended terminating Tahir's employement and submitted findings to the FBI's Disciplinary Review Board. Id. ¶ 26. On February 23, 2012, the FBI revoked Tahir's security clearance, and he was suspended from work. Id.

On March 1, 2012, Tahir requested his day ledgers. Id. ¶ 27. The FBI provided several day ledgers, but not those for dates relevant to the alleged fuel theft. See id. Later, the FBI advised Tahir that the missing day ledgers had been shredded. Id. According to Tahir, the FBI shredded those documents to ensure Tahir's employment termination by depriving him of the ability to defend

3

against the alleged fuel theft. Id. ¶¶ 27–28. "Upon information and belief, other non-white employees of various national origins were also being targeted for increased discipline by Mrs. McMillan at this time." Id. ¶ 29.

On May 11, 2012, the FBI's Office of Professional Responsibility ("OPR") Adjudication Unit held an oral appeal hearing at which Tahir and his representatives appeared. Id. ¶ 30. At the hearing's outset, Assistant Director Candace Will asked, "What kind of name is Tahir?" Id. Tahir responded, "Turkish. My father is Turkish." Id. Will then asked if Tahir spoke the language. Id. Tahir responded, "No." Id.

The FBI's OPR Adjudication Unit upheld Tahir's dismissal, finding termination appropriate for Lack of Candor/Lying–No Oath, Misuse of a Government Charge Card–Personal Use, and Misuse of a Government Charge Card (Theft) Gasoline or Automated–Related Expenses. Id. ¶ 31.

On May 14, 2012, the FBI notified Tahir that OPR's Adjudication Unit upheld his dismissal. Id. ¶ 32. Tahir appealed to the FBI's Human Resources Disciplinary Review Board ("HRDRB"). Id. On January 9, 2013, HRDRB staff sent a memorandum to the HRDRB recommending affirming Tahir's dismissal. Id. ¶ 33. The memorandum noted that the standard penalty for Lack of Candor/Lying–No Oath and for Misuse of a Government Charge Card–Personal Use was, respectively, a seven-day suspension. Id. The memorandum also stated that the standard penalty for Misuse of a Government Charge Card (Theft) Gasoline or Automated–Related Expenses was dismissal. Id.

On January 25, 2013, a five-member panel of the HRDRB met. Id. ¶ 34. "Upon information and belief, no members of the DRB were of Arab American decent." Id.

The HRDRB recommended dismissal based on the following four factors: (1) Tahir admitted to intentionally using his government-issued credit card for personal gain frequently,

4

repeatedly, and willfully; (2) Tahir concealed his actions by discarding and hiding government-issued credit card statements; (3) Tahir, ten years earlier, had been disciplined for similar conduct; and (4) the nature and extent of independence that Tahir had in his role as a supervisory investigative specialist. Id. ¶ 35.

The HRDRB voted unanimously to terminate Tahir's employment for Lack of Candor/Lying–No Oath and for Misuse of a Government Charge Card–Personal Use. See id. ¶ 36. The HRDRB found insufficient evidence of Misuse of Government Charge Card (Theft) Gasoline or Automated-Related Expenses and vacated that charge. Id.

According to Tahir, "the prior disciplinary history for employee violations very rarely resulted in such a vicious sanction as termination for [Lack of Candor/Lying–No Oath and for Misuse of a Government Charge Card–Personal Use]." Id. ¶ 38. "Still, OPR and DRB recommended a severe disciplinary action for Mr. Tahir, an Arab American whose national origin was paraded in front of them due to the Oral Hearing held by the OPR, with alleged misconduct occurring at the nation's most notorious Arab terrorist breeding ground, Dearborn, MI." Id. ¶ 38.

On February 10, 2013, Tahir filed an EEO complaint alleging national origin discrimination. Id. ¶ 39. On May 5, 2016, an ALJ rejected the claim and granted summary judgment to the FBI. Id. ¶ 40. On June 14. 2016, the FBI notified the parties that it accepted the ALJ's decision in favor of the FBI. Id. ¶ 41.

On August 31, 2016, Tahir filed this action alleging that the FBI terminated his employment due to his national origin in violation of Title VII. On January 5, 2017, defendant moved to dismiss Tahir's complaint for failure to state a claim upon which relief can be granted.

II.

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal and factual sufficiency of the

5

complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013). A court need not accept as true a complaint's legal conclusions or unwarranted inferences, unreasonable conclusions, or arguments. Giarratano, 521 F.3d at 302 (quotation omitted); Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausib[ility]." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co., 637 F.3d at 448; see Fed. R. Civ. P. 10(c); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may take judicial notice of public records such as court documents without converting the motion to dismiss into a motion for summary judgment. See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Tahir alleges national origin discrimination in violation of Title VII. Title VII makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Tahir alleges that defendant terminated his employment based on his national origin and thereby violated Title VII.

Tahir lacks direct evidence of discriminatory termination; therefore, he relies on the burden-shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, a plaintiff must prove a prima facie case of illegal discrimination by showing that (1) he is a member of a protected class; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of his discharge; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. See, e.g., Hill v. Lockhead Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc); Dugan v. Albemarle Cty. Sch. Bd., 293 F.3d 716, 720 n.1 (4th Cir. 2002); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); see also Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016); Miles v. Dell, Inc., 429 F.3d 480, 485–89 (4th Cir. 2005).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can demonstrate pretext by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted).

To survive a motion to dismiss, a Title VII plaintiff must plausibly allege his statutory claim,

although he need not allege a prima facie case under McDonnell Douglas. See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585–88 (4th Cir. 2015), cert. denied, 136 S. Ct. 1162 (2016). As for causation, the Fourth Circuit has held that "[f]or status-based discrimination claims, the employee must 'show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.'" Guessous v. Fairview Prop. Invs., LLC, 828 F.3d at 216–17 (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2523 (2013)). Thus, to state a Title VII status-based claim, a plaintiff must plausibly allege the requisite causal connection between the plaintiff's protected status and the alleged discrimination. See Guessous, 828 F.3d at 216–17.

"[N]aked allegations" of a causal connection between the plaintiff's national origin and the alleged discrimination do not state a plausible Title VII claim. See McCleary-Evans, 780 F.3d at 585–86 (quotation omitted). For example, in McCleary-Evans, the Fourth Circuit held that a plaintiff failed to state a claim when she alleged that "non-Black decisionmakers hired non-Black applicants instead of the [Black] plaintiff" because they had "predetermined to select for both positions a White male or female candidate." Id. (quotation omitted). Although the allegation was "consistent with discrimination, it [did] not alone support a reasonable inference that the decisionmakers were motivated by bias." Id. at 586 (emphasis in original). In McCleary-Evans, the plaintiff described at length her own qualifications for the job, but she "did not include any allegations regarding the qualifications or suitability of the persons hired." Id. at 583–84. The Fourth Circuit noted that the employer may have hired the non-Black candidates because they were "better qualified, or . . . perform[ed] better during their interviews, or were . . . better suited based on experience and personality for the positions." Id. at 586. Or, the employer might have acted discriminatorily. See id. Without plausible factual allegations of appropriate hiring comparators

(i.e. qualifications, interview performance, suitability for the job), the court could only speculate as to why the employer hired the non-Black individuals. Id. To satisfy the causal element of her Title VII claim, a plaintiff must plausibly allege that "the motive to discriminate was one of the employer's motives." Id.; see Nassar, 133 S. Ct. at 2523; Guessous, 828 F.3d at 216.

Tahir fails to state a claim because he does not plausibly allege the requisite causal connection between his national origin and his discharge. First, Tahir's bare allegation that he is an Arab American and was discharged does not plausibly allege national origin discrimination. See McCleary-Evans, 780 F.3d at 585–86.

Next, Tahir claims that the FBI disregarded precedent, deprived Tahir of an opportunity to defend himself against one of the charges against him, and punished Tahir too severely. See Compl. ¶ 46. Those allegations, without more, do not plausibly support a reasonable inference that the FBI discharged him due to his national origin. See McCleary-Evans, 780 F.3d at 582, 584. Tahir's allegation that the FBI applied a harsher-than-usual punishment to him does not equal a plausible allegation that the FBI failed to discharge a non-Arab American comparator who admitted to intentionally using his government-issued credit card for personal gain frequently, repeatedly, and willfully, who concealed his actions by discarding and hiding government-issued credit card statements, who ten years earlier had been disciplined for similar conduct, and who had the same level independence that Tahir had in his role as a supervisory investigative specialist. Thus, Tahir's conclusory allegation concerning "precedent" arising from the FBI's prior treatment of employees charged with similar offenses does not plausibly support a reasonable inference that national origin was a motivating factor in his termination. See McCleary-Evans, 780 F.3d at 584–86. Moreover, Tahir's suggestion that the FBI deprived him of the opportunity to defend himself against charges adds nothing because that allegation only concerns the vacated charge of Misuse of a Government

9

Charge Card (Theft) Gasoline or Automated-Related Expenses.

Tahir's suggestion that the FBI punished him too severely for his repeated misconduct does not plausibly allege national origin discrimination because it is not accompanied by a plausible allegation concerning a similarly-situated comparator who was not an Arab American who was not discharged. See, e.g., id.; Taylor v. Va. Union Univ., 193 F.3d 219, 234 (4th Cir. 1999) (en banc); abrogated in part on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105–06 (4th Cir. 1985); Iskander v. Dept. of Navy, 116 F. Supp. 3d 669, 679–80 (E.D.N.C. 2015), aff'd, 625 F. App'x 211 (4th Cir. 2015) (per curiam) (unpublished). Finally, Tahir's allegations concerning Assistant Director Will's questions about the name Tahir and whether Tahir spoke Turkish do not support "a reasonable inference that the decisionmakers were motivated by bias." McCleary-Evans, 780 F.3d at 585–86 (emphasis in original). At most, the inquiries suggest that the OPR Adjudication Unit was aware that Tahir was Arab American. Knowledge of protected status under Title VII, however, is not enough to reasonably infer causation under Title VII. See, e.g., Gibson v. Old Town Trolley Tours of Wash., D.C., Inc., 160 F.3d 177, 182 (4th Cir. 1998) (collecting cases). Accordingly, Tahir's national origin discrimination claim fails to state a claim upon which relief can be granted.

III.

In sum, the court GRANTS defendant's motion to dismiss [D.E. 12] and DISMISSES plaintiff's complaint without prejudice.

SO ORDERED. This 2 day of May 2017.

JAMES C. DEVER III
Chief United States District Judge